UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DOLORES MCKENZIE as Personal Representative for the ESTATE OF CLARENCE MCKENZIE,<br><br>PLAINTIFF,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>DEFENDANT. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No: |

## COMPLAINT

NOW COMES Plaintiff, Dolores McKenzie as Personal Representative for the Estate of Clarence McKenzie, and hereby complains against Defendant, The United States of America, as follows:

### SUMMARY OF THE CASE

This is a tort claim brought pursuant to the Federal Torts Claim Act for personal injuries and the wrongful death of Vietnam-era military veteran Clarence McKenzie. Mr. McKenzie received medical care in 2018 at Togus VA and was emergently transferred to West Roxbury VA for carotid endarterectomy surgery on August 31, 2018. He was discharged from West Roxbury VA on September 5th and sent back to Maine in the Togus shuttle bus in his pajamas and socks for an estimated 6–8-hour one-way trip. Mr. McKenzie arrived back in Maine around six o'clock that evening and died later that night. His death was caused by medical malpractice committed by the employees and agents of the Togus Veteran Affairs Medical Center (Togus VAMC) and West Roxbury Veteran Affairs Medical Center (West Roxbury VAMC).

1

## JURISDICTION AND VENUE

X. This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1346(b), 2401(b), and 2674 et seq.

X. Venue is properly vested in this Court because Plaintiff is resident of this District as was Clarence McKenzie, an honorably discharged veteran, and the acts complained of, in part, occurred within the jurisdiction of this District, namely Kennebec County, Maine.

X. Plaintiff has complied with all necessary administrative requirements required by the Federal Tort Claims Act, prior to filing this lawsuit.

X. Plaintiff's original Notice of Claim for Damage, Injury or Death (Standard Form 95) was served on the U.S. Department of Veterans Affairs on or about January 14, 2019, which was within two-years of Clarence McKenzie's death.

X. Prior to receiving a denial letter and while the claim was still being considered, Plaintiff served an Amended Standard Form 95 on the U.S. Department of Veterans Affairs on or about May 4, 2021.

X. On May 18, 2021, the U.S. Department of Veterans Affairs issued letters denying Plaintiff's administrative claim.

X. This lawsuit is being commenced within six months of the U.S. Department of Veterans Affairs denial letters.

## PARTIES

X. At all times relevant, Dolores McKenzie (Mrs. McKenzie) was an individual residing in Gardiner, Kennebec County, Maine, and the spouse of Clarence McKenzie ("Mr. McKenzie), an individual residing in Gardiner, Kennebec County, Maine.

X. Togus VAMC and West Roxbury VAMC are health care centers organized under the United States Department of Veterans Affairs and the Veterans Health Administration. Each medical provider who cared for Mr. McKenzie at Togus VAMC and West Roxbury VAMC, including Christopher Jenner, NP, Daniel A. Soroff, M.D., Joseph D. Raffetto, M.D., Chester H. Conrad M.D. Ph.D, Jamil Kirdar, M.D., Nisha Kumar, M.D., Michelle C. Martin, M.D. and Sayf Altabaqchali, M.D., were at all relevant times an employee or agent of Togus VAMC and/or West Roxbury VAMC, acting within the scope of his or her employment or authority as an agent. The United States of America is therefore the appropriate party Defendant.

## FACTS

X. On January 18, 2018, Mr. McKenzie reported to Maine General Medical Center (MGMC) for right sided weakness in his upper and lower extremities, slurred speech, right facial droop, and loss of bladder control. By the time he arrived at MGMC, his symptoms had mostly resolved.

X. A CT was performed, which was negative. He was discharged to home, with instructions to follow up with his PCP.

X. Mr. McKenzie saw his primary care physician, Christopher Jenner, NP the following day. An ultrasound was performed on his carotid, which revealed total occlusion of his left internal carotid artery and less than 50% stenosis of his right internal carotid artery, and Mr. McKenzie was sent to the emergency department.

X. At the hospital, vascular surgery was urgently consulted, but they did not believe surgical management was indicated.

X. However, doctors were concerned about Mr. McKenzie's ongoing neurological symptoms and "blank episodes" which were suggestive of recurrent mini-strokes and possibly seizures.

X. A CT was performed on January 23, 2018, which revealed an atrophy pattern with periventricular white matter ischemic changes that had progressed since his prior CT in 2014, and there also appeared to be a new 1.4 cm left insular subcortical white matter infarct.

X. A neurologist was consulted and examined Mr. McKenzie. He believed that Mr. McKenzie had a stroke.

X. An MRA on January 24, 2018 showed lack of flow in the left internal carotid artery.

X. Mr. McKenzie had his initial cardiology consultation with Daniel A. Soroff, M.D., VA Cardiac Electrophysiologist on February 6, 2018. He recommended placement of a 21 day event monitor to assess the possibility of undiagnosed atrial fibrillation or atrial flutter.

X. On March 23, 2018, Mr. McKenzie had a follow up with Dr. Soroff. He believed that the most likely etiology of Mr. McKenzie's stroke was cerebrovascular disease.

X. Dr. Soroff's assessment was that Mr. McKenzie had a mildly dilated left atrium, frequent premature atrial contractions, and was at increased risk for atrial fibrillation or atrial flutter. A previous eye exam revealed evidence of retinal hemorrhage.

X. Dr. Soroff recommended a loop recorder implant for long-term rhythm monitoring, due to his recent stroke and abnormal EKG and telemetry. The loop recorder implant was placed on May 7, 2018.

X. One week following the placement of the loop recorder, Mr. McKenzie had a follow up visit with Dr. Soroff. Multiple arrythmias were detected for sudden onset sudden offset narrow complex tachycardia, which appeared to be triggered by a PVC and had a short RP interval.

X. Dr. Soroff saw Mr. McKenzie again for a wound check the following week and recommended follow up in 3 months.

X. On August 24, 2018, Mr. McKenzie presented to Togus VA emergency department with complaints of sudden weakness of the right face, arm, leg, slurred speech, and aphasia.

X. Mr. McKenzie did not recall the incident, but Mrs. McKenzie reported that he had a right facial droop, right sided weakness, and needed three people to carry him to the chair.

X. While in the emergency department, his symptoms mostly resolved, but he continued to have minimal right sided weakness. He was admitted to the hospital.

X. Doctors believed that his symptoms were likely most consistent with hypoperfusion of the left hemisphere due to known carotid occlusion, although there was still suspicion for a small stroke.

X. A CT of the head revealed a new area of cortical lucency and/or encephalomalacia involving the left parietal lobe.

X. Ultrasound of the carotids revealed 50-69% stenosis of the right internal carotid artery and complete occlusion of the left internal carotid artery.

X. Cardiology, neurology, and vascular surgery consults were performed by the Togus VA doctors on August 27th.

X. At that time, Dr. Soroff reviewed Mr. McKenzie's loop recorder and found evidence of possible atrial flutter in July, and no findings that would suggest a cardioembolic cause of stroke. Dr. Soroff recommended an MRI of the brain and a medical regimen of Plavix and high-dose statin to reduce his risk of recurrent stroke.

X. Mr. McKenzie was seen by vascular surgery, who sent a consult to Boston VHCS vascular service for an opinion, because Togus did not have a vascular surgeon present.

X.      Boston VHA believed that Mr. McKenzie was a candidate for carotid endarterectomy, and he was transferred to West Roxbury VHA on August 29th for surgery.

X.      Upon arrival at West Roxbury VHA, the Chief of Vascular Surgery, Joseph D. Raffetto, M.D. believed that the need for surgery was urgent and should not be delayed for an ischemia workup.

X.      Chester H. Conrad M.D. Ph.D, VA Staff Physician in the Cardiology Section and cardiology fellow Sayf Altabaqchali, M.D. were consulted, and the collective opinion was to move forward with surgery rather than doing a stress test.

X.      On August 31st, Dr. Raffetto performed a left carotid endarterectomy with bovine pericardium patch angioplasty on Mr. McKenzie.

X.      During the surgery, Mr. McKenzie had a run of V tach, which progressed in asystole (flatline) and required CPR. He was ultimately resuscitated.

X.      Staff Cardiologist Jamil Kirdar, M.D. was consulted, and he recommended a nuclear stress test once Mr. McKenzie was stabilized medically.

X.      According to his September 1st note, Dr. Kirdar then planned to rely on his colleagues in Consult Cardiology coming upon the September 4th rotation to decide and follow up on his suggestion or scheduling of an ETT (exercise tolerance test).

X.      Mr. McKenzie met with a VA physical therapist on September 4th. At that time, Dr. Roy was unable to assess Mr. McKenzie's ability to walk up and down the stairs, due to his fatigue after walking.

X.      Mr. McKenzie was scheduled for a stress test to take place on the morning of September 5th.

X.      On September 5th, VA employee, resident Nisha Kumar, M.D. and her supervising practitioner, Michelle C. Martin, M.D., determined that Mr. McKenzie was stable to be discharged from a surgical perspective and that he would likely go home if he was able to "clear the stairs".

X.      Rather than have Mr. McKenzie do a stress test prior to discharge, VA employees, including but not limited to Dr. Kumar and cardiology fellow Sayf Altabaqchali, M.D. determined that the inpatient stress test was not necessary and instead could be performed as an outpatient.

X.      This decision to do an outpatient stress test was made despite acknowledgment by cardiology that Mr. McKenzie did need a stress test and close cardiology follow up.

X.      The September 5th stress test was cancelled, and Mr. McKenzie was scheduled for an outpatient stress test on September 18th.

X.      West Roxbury VHA discharged Mr. McKenzie on September 5th at 12:45 p.m.

X.      Mr. McKenzie's discharging physician was Dr. Kumar and the attending physician was Dr. Raffetto.

X.      Mr. McKenzie was sent home to Maine on the Togus shuttle bus and boarded the shuttle bus in hospital issued pajamas, and without any shoes, money, food, or other personal belongings.

X.      Mr. McKenzie arrived at Togus around 6 p.m. He was hungry and had edema in both legs.

X.      His family was concerned that he did not have some of his medications and called to speak with the West Roxbury VHA about Mr. McKenzie's condition, who told them to call back to the vascular service in the morning for further instructions.

X.      Mr. McKenzie died less than four hours after he returned to Maine on the shuttle bus.

7

X.      An autopsy was performed, and Mr. McKenzie's immediate cause of death was determined to be recent subendocardial myocardial infarction of less than 12 hours duration, posterior left ventricle with evidence of cardiac failure.

X.      Contributing factors to his death were determined to be coronary arteries with occlusion of the distal right coronary artery and recanalization; evidence of myocardial infarction of varying ages from approximately two weeks (anterior) to remote left posterior ventricular myocardial infarcts; biventricular and bilateral dilation; thoracic aorta; bilateral carotid arteries with 50% stenosis of the right coronary artery; status post left carotid endarterectomy; and serous pericardial effusion.

## CAUSES OF ACTION

## COUNT I – WRONGFUL DEATH

X.      Plaintiff repeats and realleges all allegations set forth in Paragraphs 1 through ___, above.

X.      Defendant was negligent in failing to ---

X.      --- was negligent in ---

X.      By reason of the foregoing, Plaintiff is entitled to recover against the United States of America pursuant to the Federal Tort Claims Act.

## COUNT II – CONSCIOUS PAIN AND SUFFERING

X.      Plaintiff repeats and realleges all allegations set forth in paragraphs 1 through ____ above.

X.      Prior to his death, Mr. McKenzie suffered from a period of conscious pain and suffering.

WHEREFORE, Plaintiff demands judgment against The United States of America for compensatory damages in the amount of $1,500,000 and for attorney's fees and costs, together with such other, further, and additional relief as permitted by law, and any further relief that this Court deems appropriate.

| | |
|---|---|
| August 13, 2021 | /s/ Owen Pickus, DO., Esq. |
| Date | Owen Pickus, DO., Esq. |
| | Bar No. 4248 |

*Owen Pickus, DO, Esq. & Associates*
2 Storer Street, Ste. 200-A
Kennebunk, ME  04043
(207) 467-9146
Attorney for Plaintiff